# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

WILLIAM D. CONLON,

        Plaintiff,

v.                                                                Case No. 08-CV-20

MICHAEL J. ASTRUE,

        Defendant.

_____

## ORDER

On January 1, 2008, plaintiff William D. Conlon ("Conlon") filed a complaint seeking review of a decision by the Commissioner of Social Security ("Commissioner") denying Conlon's application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). After his original application for benefits was denied, Conlon requested, and was granted, a hearing before an Administrative Law Judge ("ALJ"). On May 30, 2007, the ALJ found that Conlon was not disabled and was, therefore, ineligible for DIB and SSI. Conlon sought review of the ALJ's decision by the Commissioner's Appeals Council. On November 9, 2007, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). Conlon now asks the court to reverse the ALJ's decision or remand the case back to the Commissioner for further proceedings.

## BACKGROUND

As of the date of the ALJ's decision, Conlon was forty-five years old, with an 11th grade education. (Tr. 22, 218-19). Conlon had some work experience as a forklift operator, a machine operator and a telemarketer. (Tr. 219-21). Conlon testified before the ALJ that he left his last job as a telemarketer in October of 2004 due to poor sales and because he was "very depressed." (Tr. 220-21). After quitting work as a telemarketer, Conlon testified that he "just decided to drop out of the work scene." (Tr. 221). On September 9, 2004, Conlon applied to the Social Security Administration ("SSA") for DIB and SSI benefits, claiming that he became disabled on September 1, 2002. (Tr. 44). At the evidentiary hearing before the ALJ, Conlon amended the date of his disability onset to August 23, 2004. (Tr. 15).

A review of Conlon's medical records reveals that he began seeking medical treatment for psychological impairments as early as July of 2004. On July 15, 2004, Conlon saw a therapist, Kimberly Goins ("Goins"), for an initial assessment. (Tr. 15, 137). At that assessment, Goins noted Conlon's complaints of a lack of motivation to work, and feelings of depression, as well as Conlon's history of alcohol, marijuana and cocaine use. (Tr. 138). Goins's assessment also references diagnoses of dysthymia and attention deficit hyperactivity disorder ("ADHD"). (Tr. 144). Goins saw Conlon again on August 5, 2004, at which point she reported a deterioration in Conlon's level of functioning, and referred Conlon to a medical doctor for continued psychotherapy. (Tr. 136). On September 10, 2004, Conlon was evaluated by Doctor

Michael Bell, a psychiatrist, who noted that Conlon presented with a history of depression, the symptoms of which included anhedonia, depressed mood, decreased energy, worthlessness and hopelessness, decreased concentration, and episodes of mania.[1] (Tr. 105-09). Dr. Bell diagnosed Conlon with bipolar disorder II and polysubstance abuse, and started Conlon on lithium carbonate. (Tr. 108). Dr. Bell also assigned Conlon a Global Assessment of Functioning ("GAF") score of 70 as of the date of Dr. Bell's evaluation, and a GAF of 75 over the previous year. (Tr. 108).

Conlon continued to see Dr. Bell after his initial diagnosis. On October 6, 2004, Dr. Bell noted that Conlon was doing well, and that Conlon was "thinking of going back to work part-time." (Tr. 134). Dr. Bell also noted moderate improvement in Conlon's level of functioning and recommended that Conlon continue use of medication. (Tr. 134). On December 16, 2004, Dr. Bell reported that Conlon was concerned about returning to work due to the additional stress, but that Conlon was taking his medication and staying sober. (Tr. 133). Dr. Bell continued Conlon's medication and referred Conlon to two community groups helping persons with mental illness and their families. (Tr. 133). On January 20, 2005, Dr. Bell reported that Conlon had gone to at least one of the recommended community groups, and that Conlon showed minimal improvement in functioning. (Tr. 132).

---

[1] Dr. Bell also noted Conlon's history of drug abuse, as well as a family history of bipolar and or schizoaffective disorder. (Tr. 106).

-3-

In November of 2004, Conlon's medical records were reviewed by a medical consultant from Wisconsin's Department of Health and Family Services ("DHFS"). The consultant found Conlon's records demonstrated that he suffered moderate restriction of activities of daily living and moderate difficulties in maintaining concentration, persistence or pace, as well as mild difficulties in maintaining social functioning. (Tr. 127). In his summary conclusions, the DHFS consultant also found moderate limitations in Conlon's abilities to understand and remember detailed instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and his ability to interact appropriately with the general public. (Tr. 113-14). The consultant also found Conlon to be moderately limited in his ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 114).

On February 17, 2005, Dr. Bell completed a form entitled "Medical Opinion Re: Ability to Do Work-Related Activities." (Tr. 146). The form provides a checklist of relatively generic mental activity categories for three types of work: unskilled work; semiskilled to skilled work; and particular work. In the unskilled work section, Dr. Bell reported Conlon to have fair or poor abilities in all of the form's sixteen activity categories. (Tr. 146-47). Dr. Bell explained his assessment by stating that Conlon had a severe form of bipolar disorder, and that Conlon exhibited frequent mood

swings and decreases in "executive functioning." (Tr. 147). Dr. Bell further stated that Conlon relied on his mother's supervision for the day to day organization of his affairs. (Tr. 147). Dr. Bell scored Conlon similarly in both the semiskilled to skilled, and the particular job sections of the form. (Tr. 148). Dr. Bell also reported that he anticipated Conlon's impairment would cause him to be absent from work about four days per month. (Tr. 149).

Conlon continued to see Dr. Bell monthly from June through December of 2005. Records from those visits to Dr. Bell reflect that Conlon had no changes in his level of functioning. Dr. Bell repeatedly noted that Conlon displayed no signs of depression or other negative symptoms. (Tr. 161-67). Dr. Bell's notes regarding Conlon's condition change in January of 2006. After seeing Conlon on January 24, 2006, Dr. Bell noted that Conlon displayed signs of moderate depression, and inappropriate anger, and that Conlon reported increased worrying and fatigue, as well has less enjoyment from pleasurable activities. (Tr. 158). Conlon next visited Dr. Bell on May 22, 2006, after which Dr. Bell noted that Conlon had admitted use of crack cocaine and alcohol. (Tr. 177). Dr. Bell further noted that Conlon's compliance with medication was irregular and that Conlon was "angry, inattentive, fully communicative, disheveled, normal weight, and looks unhappy." (Tr. 177). Dr. Bell changed his medication from lithium to the atypical antipsychotic drug Risperdal. (Tr. 177-78). Dr. Bell's notes from subsequent visits in June, July and August of 2006 focus on Conlon's financial problems and substance abuse. (Tr. 172-76).

-5-

Case 2:08-cv-00020-JPS    Filed 03/09/09    Page 5 of 17    Document 14

In September of 2006, Dr. Bell completed a form assessing Conlon's physical abilities to do work-related activities. (Tr. 179). At the evidentiary hearing, Conlon's counsel asserted that this form was sent to Dr. Bell in error. (Tr. 249-51). Dr. Bell declined to fill out several of the form's categories, including Conlon's ability to lift, carry, stand and walk during an 8-hour day.[2] (Tr. 179). Dr. Bell did opine on Conlon's ability to alternate between sitting and standing during a work day, and estimated Conlon could sit for less than two hours, and that Conlon would need to change positions every ten to twenty minutes when sitting or standing. (Tr. 180). Dr. Bell also asserted that Conlon would often have symptoms severe enough to interfere with his attention and concentration. (Tr. 180). Dr. Bell stated that his conclusions were based on Conlon's bipolar disorder, including symptoms of restlessness, severe anxiety and possible medication side effects. (Tr. 181). Dr. Bell also reiterated that Conlon's impairments would cause him to be absent from work at least three times per month. (Tr. 183).

On December 14, 2006, the ALJ held an evidentiary hearing and took testimony. Conlon testified that he was unable to work because of depression and unable to work with others due to his manic fits. (Tr. 222). Conlon stated that he was depressed seventy-five percent of the time and manic one-quarter of the time. (Tr. 223-23). During his manic fits, Conlon stated that he would be "screaming or yelling and carrying on as far as that goes." (Tr. 224). Conlon's mother testified that

---

[2]Dr. Bell noted on the form to have a primary care doctor evaluate these categories. (Tr. 179).

she was concerned about her son's behavior and mood swings. (Tr. 236). She stated that she would take Conlon to the grocery store, and help him with other chores and bills. (Tr. 236). She also stated that she considered Conlon's problems to be a result of both his substance abuse and his bipolar disorder. (Tr. 236).

A vocational expert ("VE") also testified at the hearing. The VE provided answers to two hypothetical questions. The ALJ asked the VE whether there existed any unskilled jobs in the five-county Milwaukee metropolitan area for an individual of the same age, education, and work experience as Conlon, where the individual would have no work place changes, no production rate pace work, no public contact, and only occasional co-worker and supervisor contact. (Tr. 244-45). The ALJ also noted that the hypothetical individual had no exertional limitations. (Tr. 245). The VE estimated that an individual with this residual functional capacity could work in light housekeeping or light janitorial jobs, of which there existed approximately 3,400 positions, as well as surveillance monitoring jobs, of which there existed approximately 500 positions. (Tr. 246-47). The VE also stated that the maximum absentee rate for those jobs would be 1.5 days per month. (Tr. 247). Conlon's counsel then presented a different hypothetical, asking the VE whether there existed any jobs for an individual of Conlon's age, education and work experience, in which the individual had "poor" ability to maintain attention for two hour segments or work a complete day or week without interruptions for "psychologically based symptoms," as well as poor ability to deal with normal work stress. (Tr. 255). Based on this

hypothetical, the VE stated that he didn't think such an individual could perform any jobs existing in substantial numbers. (Tr. 255).

After the evidentiary hearing, the ALJ referred Conlon for a consultative examination. The consultant, a psychologist named Mark Pushkash ("Pushkash"), completed a form statement on Conlon's work-related mental abilities, which was similar to the form completed by Dr. Bell in September of 2005. Dr. Pushkash found that Conlon's impairment affected his ability to understand, remember and carry out instructions, and that his impairment affected his ability to respond appropriately to supervisors, co-workers and work pressures. (Tr. 197-98). However, Dr. Pushkash found that Conlon's impairment presented mostly slight to no restrictions on specific work-related abilities. (Tr. 197-98). Dr. Pushkash found only one category in which Conlon had moderate restrictions, that being the ability to make judgments on simple work-related decisions. (Tr. 197). Dr. Pushkash also completed a disability report, in which he assigned Conlon a GAF score of 55. (Tr. 203). Dr. Pushkash concluded that Conlon had mild to moderately compromised ability to concentrate and persist on tasks, that he would have some difficulty appropriately relating to supervisors and coworkers, and that his ability to cope with stress and pressure "is affected by the bipolar disorder." (Tr. 203).

Conlon's counsel also submitted additional notes from Conlon's visits to Dr. Bell in October, November and December of 2006. During those visits, Dr. Bell reported that Conlon's symptoms were in partial remission, although Dr. Bell's

-8-

December 2006, notes reflect Conlon was feeling down due to his Social Security claim. (Tr. 190-92).

## ANALYSIS

When reviewing the ALJ's determination, the court will uphold the agency's findings if they are supported by substantial evidence and were reached using correct legal standards. See *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court will not reevaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the agency. *Edwards*, 985 F.2d at 336. However, where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). The ALJ need not evaluate every piece of evidence in writing, but must articulate the evidence so that the court may trace the ALJ's reasoning. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996). In other words, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.

To qualify for disability benefits under the Social Security Act, a claimant must be deemed "disabled."[3] *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

---

[3]The Social Security Act defines disability as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

-9-

The Social Security Administration has promulgated a five-step test for determining whether a claimant is disabled. *See id.* The ALJ must determine whether:

> (1) the claimant is presently employed; (2) the claimant has a severe impairment or combination of impairments; (3) the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude substantial gainful activity; (4) the claimant's residual functional capacity leaves him unable to perform his past relevant work; and (5) the claimant is unable to perform any other work existing in significant numbers in the national economy.

*Briscoe*, 425 F.3d at 351-52 (citing 20 C.F.R. §§ 404.1520, 416.920). The claimant bears the burden of proof for steps one through four, with the burden shifting to the Commissioner at step five. *See id.* (citing Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004)). In order to conclude that a claimant is disabled, the ALJ must find that steps three or five apply. See *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Here, at the first step, the ALJ found that Conlon had worked part time after the alleged onset of his impairment, but that his work could not be considered substantial gainful activity under the Social Security Administration's regulations. (Tr. 18). At the second step, the ALJ found that Conlon suffered from the severe impairments of bipolar disorder and substance addiction disorder. (Tr. 19). At the third step, the ALJ found that Conlon's impairments were not so severe as to preclude substantial gainful activity. (Tr. 19). At the fourth step, the ALJ found Conlon to have the following residual functional capacity ("RFC"): "simple, unskilled

work with no public contact, no more than ocassional [sic] contact with coworkers or supervisors, no work place changes and no production rate pace work." (Tr. 20). The ALJ also found that Conlon had no exertional limitations. (Tr. 22). Based on the RFC construct, and the testimony of the VE, the ALJ found that Conlon would not be able to perform his past relevant work. (Tr. 20). At the final step, the ALJ found, based again on his RFC construct and the VE's testimony, that Conlon could perform other work existing in substantial numbers in the national economy. (Tr. 21). Specifically, the ALJ found that Conlon could perform janitorial work. (Tr. 21). As a result of that finding, the ALJ concluded that Conlon was not disabled. At the end of his decision, the ALJ enumerated several findings, including that Conlon's allegations regarding his limitations "are not totally credible for the reasons set forth in the body of the decision." (Tr. 22).

Conlon argues that the ALJ's decision is not supported by substantial evidence and that the ALJ did not build an accurate and logical bridge between the evidence and the result. Conlon first asserts that the ALJ improperly formulated his RFC because the ALJ ignored certain limitations supported by the medical record. Specifically, Conlon asserts that the ALJ omitted limitations on Conlon's ability to concentrate and persist on tasks, and to cope with stress and pressure. In doing so, Conlon also alleges that the ALJ did not follow the Commissioner's own Social Security Ruling 96-8P, which states that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-

related abilities on a function-by-function basis. . . ." Because the ALJ's RFC did not include all of Conlon's limitations, Conlon asserts that the hypothetical question posed to the VE was also flawed. Finally, Conlon argues that the ALJ's credibility determination was improper because the ALJ did not adequately explain his reasoning.

The Commissioner responds arguing that the ALJ reasonably rejected some of Dr. Bell's extreme findings on two assessment forms because they were inconsistent with the weight of the evidence, including Dr. Bell's own treating notes. The Commissioner also asserts that the ALJ's findings were consistent with Dr. Pushkash's assessment of Conlon's work-related limitations. The Commissioner also argues that the ALJ's credibility finding was proper because Conlon had a long history of drug and alcohol abuse, multiple arrests and convictions for drug possession and offered testimony that was inconsistent with the medical records.

After reviewing the ALJ's written decision, the court is unable to conclude that it was based on substantial evidence. First, the ALJ appears to have ignored an entire line of evidence relating to Conlon's impairment when constructing an RFC. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (holding that an ALJ cannot ignore entire lines of evidence contrary to his or her ruling). Specifically, the ALJ's decision glosses over or ignores two work-related limitations that were attributed to Conlon's bipolar disorder. The medical record reflects that bipolar disorder caused Conlon problems with his ability to concentrate, as well as his ability

to deal with stress. Nearly every medical professional who assessed Conlon, including Dr. Bell, Wisconsin's DHFS consultants and Dr. Pushkash, noted some limitation on Conlon's ability to concentrate. While the ALJ's decision cited Dr. Pushkash's finding that Conlon's ability to concentrate could be affected, the ALJ never explained if or how such a limitation may have influenced his RFC determination. (Tr. 18). Additionally, the ALJ's decision did not even address whether Conlon's trouble coping with stress might limit his work-related abilities, despite the fact that both Dr. Bell and Dr. Pushkash noted that Conlon's ability to cope with stress could be affected by his bipolar disorder. Although the ALJ did not need to include every piece of evidence in his decision, the references in the record to Conlon's stress and concentration problems are too great to ignore. What is more, the import of these problems on Conlon's ability to perform work is reflected by the VE's response to a follow up question asked by Conlon's counsel during the ALJ's evidentiary hearing. When Conlon's counsel added limitations involving a lack of concentration and stress to the ALJ's RFC construction, the VE testified that no jobs existed for such an individual.

The court also finds the ALJ's credibility determination to be inadequate. As long as the record contains support for it, the court will defer to the ALJ's credibility assessments. *See Berger v. Astrue*, 516 F.3d 539, 546 (7th Cir. 2008) (citation omitted). An ALJ's credibility assessment must make clear the weight that the ALJ gave to the claimant's testimony, and the ALJ's reasoning. *See Arnold v. Barnhart*,

473 F.3d 816, 822-23 (7th Cir. 2007) (citing Social Security Ruling 96-7p). Here, the court is unable to say whether the ALJ's credibility assessment with respect to Conlon is supported by the record, because the ALJ's decision does not provide sufficient reasoning. At the end of his decision, the ALJ found Conlon's allegations regarding his work-related limitations to be "not totally credible for the reasons set forth in the body of the decision." (Tr. 22). In his decision, the ALJ cites a portion of Conlon's testimony, and suggests that Conlon has a history of "self indulgent behavior" after noting Conlon's past drug and alcohol use, as well as Conlon's prior incarceration. (Tr. 16, 19). However, the ALJ's decision never weighs Conlon's testimony against conflicting evidence or otherwise articulates the reasoning for discounting Conlon's testimony. As a result, the court cannot say that the ALJ's credibility finding with respect to Conlon is based on substantial evidence.

The court is also concerned with the ALJ's wholesale rejection of Dr. Bell's evaluation of Conlon's work-related abilities. The ALJ rejected Dr. Bell's work-related assessments as extreme, claiming that Dr. Bell "may not be entirely objective with elements of advocacy on his part to help claimant get disability." (Tr. 19). In support of this determination, the ALJ cited an inconsistency within the forms filled out by Dr. Bell relating Conlon's potential absenteeism from work, and the fact that Dr. Bell, a psychiatrist, was willing to complete a form addressing Conlon's physical work-related limitations. In two form evaluations, Dr. Bell marked two different estimates to the question of how often Conlon's impairments would cause him to be

absent from work. On one form, Dr. Bell marked both "about three times a month" and "more than three times a month." (Tr. 183). On the other form, Dr. Bell marked "about four days per month." (Tr. 188). These are not necessarily internally inconsistent as the ALJ asserts. Even if they were, the ALJ has not provided his reasoning for completely discounting the possibility that Conlon's bipolar disorder could result in absences from work.[4]

The ALJ's decision also questioned Dr. Bell's objectivity because Dr. Bell was willing to complete a form assessing Conlon's physical, rather than mental, work-related limitations. The ALJ asserted the Dr. Bell, being a psychiatrist, was not qualified to make assessments of Conlon's physical exertion limitations, and that Dr. Bell did not provide any reason for his findings. However, Dr. Bell declined to fill out much of the form, noting that a primary care physician would be better placed to complete those sections. Dr. Bell also provided reasoning for the limited assessments made on the form, stating that the limitations were a result of specific symptoms caused by Conlon's bipolar disorder and medication. (Tr. 181-82). Therefore, the ALJ's reasoning for dismissing Dr. Bell's assessments seems to have been based on an inaccurate view of the record.

Finally, the ALJ asserted that Dr. Bell's assessment of Conlon's work-related functionality was at odds with Dr. Bell's own progress notes and the observations of

---

[4] The ALJ did discuss acceptable absentee rates with the VE during the evidentiary hearing, at which time the VE testified that the jobs existing for the RFC presented by the ALJ would generally allow an absentee rate of 1.5 days per month.

-15-

Dr. Pushkash. An ALJ is often called upon to choose between conflicting opinions between treating and consulting physicians, but in doing so the ALJ must consider factors such as "the length, nature, and extent of the treatment relationship; the physician's specialty; and the consistency and supportability of the physician's opinion." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (citations omitted). Here, the ALJ cited, but dismissed portions of Dr. Bell's findings without providing a reasoned explanation. The ALJ paints Dr. Bell's progress notes and Dr. Pushkash's evaluation as showing Conlon's impairments were not as severe as Conlon and Dr. Bell portrayed them. However, the court's review of Dr. Bell's notes, as discussed above, reveals that Conlon's condition neither substantially improved nor substantially deteriorated after Dr. Bell's initial diagnosis of Conlon's impairments in September of 2004. Moreover, Dr. Bell's progress notes from May of 2006 reflect that Conlon's drug therapy for his bipolar disorder was changed from a lithium-based drug to an atypical antipsychotic drug. At the same time, Dr. Pushkash's assessment does not appear to be as much at odds with Dr. Bell's assessment as the ALJ asserts in his decision. Dr. Pushkash's report included many of the same limitations identified by Dr. Bell, and Dr. Pushkash gave Conlon a GAF score of 55, which is in a lower functionality subcategory than the score of 70 Dr. Bell gave in September of 2004. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., text rev. 1994) (categorizing GAF scores of 51-60 as "moderate symptoms or moderate difficulty in . . . occupational

-16-

Case 2:08-cv-00020-JPS   Filed 03/09/09   Page 16 of 17   Document 14

. . . functioning" and GAF scores of 61-70 as "some mild symptoms or some difficulty in . . . occupational . . . functioning"). Therefore, the court is unable to conclude that the ALJ has constructed an accurate and logical bridge between the evidence and his conclusion.

Because the court finds the ALJ's reasoning to be flawed in assessing both the medical records and Conlon's credibility, the court concludes that the ALJ's decision was not based on substantial evidence. As a result, the court is obliged to vacate the ALJ's decision and remand with the expectation that further proceedings will result in a more thorough consideration of this case.

Accordingly,

**IT IS ORDERED** that the ALJ's decision be and the same is hereby **VACATED** and **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion.

The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 9th day of March, 2009.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge